IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 11, 2004 Session

# IN RE: D.L.L. & R. H. F.

**Appeal from the Juvenile Court for Macon County**
**No. 01-140420 & 01-140206     Ken Witcher, Judge**

---

**No. M2003-02736-COA-R3-PT - Filed - July 22, 2004**

---

The trial court terminated the parental rights of a mother to her two teenage sons on the grounds of abandonment, failure to comply with the permanency plan, and failure to remedy the conditions that led to the children being removed from her custody. After thoroughly examining the record, we agree with the trial court that all those grounds have been proved by clear and convincing evidence and that it is in the best interest of the children that the mother's parental rights be terminated.  We also find that the Department of Children's Services made reasonable efforts to assist the mother, but that her own lack of honest effort rendered that assistance ineffective. We accordingly affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S. and WILLIAM B. CAIN, J., joined.

Christi L. Dalton, Hartsville, Tennessee, for the appellant, J.O.C.

Paul G. Summers, Attorney General and Reporter; Douglas Earl Dimond, Assistant Attorney General, for the appellee, Department of Children's Services.

## OPINION

### I. CUSTODY PROCEEDINGS

This case involves the termination of the parental rights of Mother to two of her sons, D.L.L. (born 7-22-86), and R.H.F. (born 2-15-89).  At the time of the termination proceedings below, both children were in the legal custody of the Department of Children's Services (DCS).  R.H.F. was in the physical custody of Mother's sister, Alma Sliger.  D.L.L. was living in a therapeutic youth home.

Alma Sliger and her late husband Carl began taking care of R.H.F. in 1993, after R.H.F., D.L.L., and their two-year old sister were found abandoned and living in a car, and the Sligers and other family members took it upon themselves to assume the duties that Mother was unwilling or unable to exercise. On May 1, 1993, the Sligers filed a Petition in the Juvenile Court of Macon County for temporary custody of R.H.F. The trial court granted the petition shortly thereafter. The record shows that the Sligers have provided R.H.F. with a supportive and loving home environment.

D.L.L. apparently remained within the legal custody of Mother, and largely subject to her distracted and sporadic care, until the year 2000, when he was fourteen years of age.[1] At that time, three delinquency petitions brought him into the custody of the juvenile court. He was placed in a group home, and apparently made some progress during his stay. While D.L.L. was living in the group home, his mother was in jail on a drunken driving conviction. The youngster was released from juvenile detention on June 1, 2001, and went to live with other relatives. D.L.L. subsequently ran away, and DCS did not know his whereabouts for eight or nine months,[2] but he was subsequently found and placed in a therapeutic youth home.

In 2001, the Sligers filed another petition for custody of R.H.F., and DCS filed a petition for D.L.L. to be declared a dependent and neglected child within the meaning of state law. On August 15, 2001, the Juvenile Court of Macon County conducted a hearing on the petitions. Counsel had been appointed for Mother, and a guardian ad litem was appointed to represent the children's interests. On September 18, 2001, the court filed an order setting out its findings and confirming DCS custody.

The court stated that it found both children to be dependent and neglected because Mother had left them unsupervised on numerous occasions and failed to provide food or support for them. The court noted that she also admitted to prostitution, to drug and alcohol use in the presence of the children, and to having men sleep over while the children were present in the home. In light of these circumstances, the court ordered DCS to retain temporary legal custody of the children, but made no change in the arrangements for physical custody. Mother was granted visitation rights and was ordered to pay child support of $91.35 per week for both children. She did visit from time to time, but she never paid any support.

On September 6, 2001, DCS created the first of a series of permanency plans for both children, with concurrent planning for either their return to Mother's custody or relative placement. In order to regain custody, Mother was required (1) to undergo an alcohol and drug assessment and complete any recommended program; (2) attend AA/NA meetings; (3) not possess drug paraphernalia; (4) submit to and pay for random drug screenings; (5) not be involved with criminal activity; (6) not have different people staying overnight with her; (7) maintain her health and

---

[1] The record shows that Mother was convicted of misdemeanor assault in the General Sessions Court of Sumner County for punching D.L.L. in the face during an argument.

[2] The evidence suggests that he spent most of that time with either his mother or one of her ex-husbands.

employment; and (8) notify her case worker of any changes in her environment. Unfortunately, Mother did not comply with these provisions.

## II. TERMINATION PROCEEDINGS

On February 28, 2003, DCS filed a Petition to terminate the parental rights of Mother as well as of the putative fathers of the two boys. The petition stated that since the Juvenile Court's custody order over a year earlier, none of the parents had contributed to the children's support, and the two putative fathers had not exercised any visitation. The petition alleged Mother had visited with R.H.F at the Sligers' home, but only on a sporadic or token basis, and she had not sought visitation with D.L.L. during the six months prior to the filing of the petition. The petition further recited that Mother had been duly informed on two occasions that willful failure to visit or willful failure to contribute to the support of the children would be grounds for termination of her parental rights.

A hearing on the Petition was conducted on October 10, 2003. The court heard the testimony of the children's mental health counselor, as well as several DCS case managers and a DCS supervisor, all of whom had worked with the children and/or Mother. The mental health counselor testified that Mother was in the habit of making extravagant promises to R.H.F., which she never kept, that the pattern of promise and disappointment was a disruptive factor in the child's life, and that it was in his best interest that she have no contact with him until age 18.

The DCS supervisor testified as to Mother's shocking disregard of the well-being of her daughter, who was in the custody of an ex-husband in another county. Mother allegedly told the supervisor that her ex-husband was unwilling to let her see the daughter unless she agreed to have sex with him. Mother told her that at least she knew where her daughter was, and that "if it's my daughter getting the hell beat out of her, it's better her than me."[3]

The social workers were unanimous in their testimony that Mother had taken almost no affirmative steps to comply with any of the provisions of the permanency plan. As many of the tasks assigned to Mother indicate, overcoming her habits of drug and alcohol abuse was a necessary step on the road towards any possibility of restoring R.H.F. and D.L.L. to her custody. But Mother's approach to those requirements showed that she put very little effort into dealing with the problem.

Mother's attorney chose not to call her to testify, but the Guardian ad Litem did call her. Her testimony was perhaps more damaging to her case than the testimony of all the other witnesses combined. On the stand, she was by turns defiant, defensive and dishonest. She repeatedly failed to provide direct answers. Her testimony was so vague and inconsistent that it is difficult to

---

[3]Another example of Mother's apparent indifference to the emotional well-being of her children is the fact that just prior to the termination hearing, she told them that she had been diagnosed with terminal cancer and that was the reason DCS was seeking termination of her parental rights. When questioned about this at the hearing, she was unable to furnish the court with the name of the diagnosing doctor, the date of diagnosis, or any information at all that would substantiate the purported diagnosis.

adequately summarize it here, but she offered a litany of excuses for her failure to take the necessary steps for the return of her children to her, for the most part blaming others for her own failings.

For example, Mother testified that she underwent an alcohol and drug assessment as required by every permanency plan from the very beginning, but admitted that it did not occur until two days before the termination hearing.[4] Since the plan required her to pay the $200 cost of the assessment, she claimed that she couldn't afford it. However, she admitted that in 2001 she had managed to buy a 1996 Blazer for $5,650 and she had acquired some gold jewelry.

She also testified that she had worked for Cracker Barrel for five months and Sav-A-Lot for three months. She did not offer any written confirmation of that employment, but if her testimony was truthful, such employment could have furnished resources for the assessment. When asked why she had waited as long as she did before getting the assessment, her answer was "that was as quick as they could get me in." Asked why she no longer had a job, she claimed that all the meetings that DCS wanted her to attend made it impossible for her to find one. But the record shows that Mother often failed to show up for scheduled meetings.

She also attempted to contradict testimony indicating a failure to attend AA/NA meetings, by stating that she had indeed gone to such meetings. Asked if she had any proof, she replied that she had some attendance slips but that she left them at home. After returning from a lunch recess, she produced some hand-written notes in different handwritings, purportedly confirming her attendance at meetings.

DCS's attorney called Mother's niece to the stand as a rebuttal witness. The niece testified that while the court was recessed, Mother asked her to sign a piece of paper saying that they had attended AA/NA meetings together, and to use a different name for her signature. The niece refused, and Mother reportedly walked off and said "well then I will do them myself or I will get them done some other way."[5]

The questioning of Mother was ended when she stated that she had to leave because her youngest son, a six year old, would be getting off the school bus at 3:30 and there was no one at home to take care of the child. Asked why she didn't arrange for someone to meet him, she said, "Well I'm hoping that the little old lady at the end of the street will be there. But that's just the chance I'm gonna be taking." The court ordered a recess so Mother could make other arrangements. When she could not, a police officer was dispatched to her home to make sure the child was all right.

---

[4] Mother told the doctor administering the assessment that she had not taken a drink or used drugs since 1997; the proof contains the record of a D.U.I. conviction in September of 2000.

[5] The trial court suggested that the Department might want to refer Mother to the district attorney for criminal prosecution for submitting false or forged documents to the court, or for perjury.

At the conclusion of the hearing, the trial court announced its decision from the bench. A lengthy order filed on November 7, 2003 contained the court's findings of facts and conclusions of law. The court found that Mother had paid no support even though she had the ability to work, and that she had engaged in only sporadic visitation. The court further found that Mother had willfully failed to comply with her permanency plan obligations, especially those related to remedying her dependency on alcohol and drugs. Finally, the court found that the conditions which led to the children's removal from her home still existed, conditions which in all probability would cause the children to be subject to further abuse or neglect, thus making it unlikely that they could be returned to her custody in the near future.

Additionally, the court found by clear and convincing evidence that it was in the best interest of the children that Mother's parental rights be terminated. The court accordingly terminated those rights on the grounds of abandonment, Tenn. Code Ann. § 36-1-113(g)(1), failure to comply with the permanency plan, Tenn. Code Ann. § 36-1-113(g)(2), and failure to remedy the conditions that led to the children being removed from her custody, Tenn. Code Ann. § 36-1-113(g)(3). The court also ordered that Mother be restrained from coming about the person or residence of either child, and that she have no contact of any kind with them. This appeal followed.

### III. LEGAL REQUIREMENTS IN TERMINATION CASES

### A. STANDARD OF PROOF

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois,* 405 U.S. 645, 651 (1972). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer,* 455 U.S. 745 (1982); *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000). Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent and of the child; the parent shall have no right thereafter to have any relationship, legal or otherwise, with the child. Tenn. Code Ann. § 36-1-113(*l*)(1). The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 565 (1996) (quoting *Santosky*, 455 U.S. at 787, 102 S. Ct. at 1412 (Rehnquist, J., dissenting)).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. To justify the termination of parental rights, the party seeking termination must prove both the grounds for termination and that termination is in the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

## B. THE RECORD ON APPEAL

Before dealing with the grounds for termination in this case, it might be useful to reiterate our recent discussion of what evidence the trial court (and this court) is entitled to rely upon in ruling on a termination petition. In the case of *In re M.J.B. & M.W.S., Jr.,* No. M2003-01167-COA-R3-PT, 2004 WL 769252, (Tenn. Ct. App. April 8, 2004)(perm. app. denied July 12, 2004), we pointed out that the constitutional magnitude of the rights involved in a termination case requires strict adherence to evidentiary rules.

As we noted, termination petitions are often preceded by dependency and neglect proceedings, which are much more informal in nature, and which involve "different goals and remedies, different evidentiary standards, and different avenues for appeal." *In Re M.J.B.* at *5. When assembling the appellate record in a termination case, it has become customary for court clerks to simply bundle the documents created during dependency and neglect proceedings with the those of the related termination proceedings, thus including in the record of the termination proceeding many documents which we are not permitted to consider.

This court can only consider those materials that have been properly made a part of the record of the termination proceeding. Documents derived from earlier proceedings can only be considered if they have been admitted as exhibits during the termination proceeding. "The appellate record in an appeal from a final termination order should consist only of (1) the petition to terminate parental rights and all pleadings and other papers subsequently filed with the lower court, (2) a transcript or statement of the evidence of the termination proceedings in the lower court, (3) the original of all exhibits filed in the lower court in the termination proceeding, and (4) any other matter designated by a party and properly includable in the record on appeal." *In Re M.J.B* at *6.

In the present case, counsel for DCS was mindful of these requirements and followed the necessary procedures to have relevant documents from earlier proceedings properly admitted into the record. These included birth certificates, the juvenile court's September 18, 2001 order of custody, and certified copies of Mother's prior convictions. Thus, even though the record sent to this court may contain some documents that should not have been included, there are sufficient properly-admitted materials to enable us to reach a decision.

## IV. THE COURT'S DECISION

The trial court found that the Department had proved three separate grounds for termination, and that it was in the best interest of D.L.L. and R.H.F. that Mother's parental rights be terminated. The trial court's order included specific findings of fact, as required by Tenn. Code Ann. § 36-1-113(k). On appeal, findings of fact by the trial court are reviewed de novo, with a presumption of correctness, unless the evidence preponderates otherwise. Tenn.R.Civ.P. 13(d).

The DCS caseworkers, the supervising case manager and the children's mental health counselor all testified as to the efforts the Department undertook to help Mother make the changes

in her life that would enable her to resume taking care of her children. They consistently found those efforts to be thwarted by Mother's own unwillingness to cooperate. They also testified that it would be dangerous for the children to be returned to her custody without major changes in her lifestyle and attitudes.

We have thoroughly examined the record, and we find that the Department has proved the three grounds for termination it asserted by clear and convincing evidence. We also find that it has proved, again by clear and convincing evidence, termination to be in the best interest of D.L.L. and R.H.F.

## V.  A QUESTION OF FINALITY

As we noted above, the petition for termination also sought to terminate the rights of two men who had been listed on the birth certificates as the fathers of D.L.L. and R.H.F. The proof showed that neither man has ever made any real contribution to raising these children, and that no meaningful relationship had ever been established between either man and his own child.[6]

D.L.L.'s father was served with the petition, but he did not file an Answer, and he failed to appear for the hearing. The court accordingly rendered a default judgment against him, terminating his parental rights on the ground of abandonment.

The court was unable to serve process on the alleged father of R.H.F. The court therefore ruled that its decree did not affect his parental rights, and that "[T]he Tennessee Department of Children's Services will set this matter for further and final hearing pending completion of service of process upon [R.H.F.'s alleged father]."

Under Rule 3 of the Rules of Appellate Procedure, a litigant is entitled to an appeal as of right to the Court of Appeals "from every final judgment entered by a trial court . . . ." The same rule defines final judgments as those that adjudicate all the rights and liabilities of all the parties, and declares that judgments that are not final are not appealable (with two exceptions that are not applicable to the present case). Thus, to the extent the putative father of R.H.F. was a party to this action, the decree in this case is not a final judgment, because it does not fully adjudicate the rights of one of the named parties.[7]

However, R.H.F.'s alleged father was not a party since he was never served with process. The deficiency in service was noted and discussed prior to the trial on Mother's rights. The parties and the trial court went forward with the petition against Mother, effectively dismissing the putative

---

[6]Mother has asserted that a DNA report disproves the paternity of the man she designated on R.H.F.'s birth certificate as his father.

[7]The issue of finality was raised by this court at oral argument.

father from this case. Consequently, the order terminating Mother's parental rights was a final order subject to appeal.

## VI.

The judgment of the trial court is affirmed. We remand this case for any further proceedings that may be necessary. Tax the costs on appeal to the appellant.

_____
PATRICIA J. COTTRELL, JUDGE